86 N.J. 592 (1981)
432 A.2d 507
STUDENT PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, A BODY CORPORATE, ALLEN GOLDBERG AND ISABELLE SAYEN, PLAINTIFFS-RESPONDENTS,
v.
BRENDAN BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, BARBARA CURRAN, COMMISSIONER OF THE BOARD OF PUBLIC UTILITIES OF THE STATE OF NEW JERSEY, AND GEORGE BARBOUR, PRESIDENT OF THE BOARD OF PUBLIC UTILITIES OF THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS.
The Supreme Court of New Jersey.
Argued May 4, 1981.
Decided July 20, 1981.
*593 Michael R. Cole, Assistant Attorney General, argued the cause for appellants (James R. Zazzali, Attorney General of New Jersey, attorney; Stephen Skillman, Assistant Attorney General, of counsel; Helen G. Bornstein, Deputy Attorney General, on the brief).
Edward L. Lloyd argued the cause for respondents.
The opinion of the Court was delivered by CLIFFORD, J.
*594 This case presents a constitutional test of the validity of defendant Barbara Curran's appointment as a Commissioner of the Board of Public Utilities (BPU). At issue is the proper interpretation of Article IV, section V, paragraph 1 of the New Jersey Constitution of 1947. That paragraph, commonly known as the ineligibility clause, reads in pertinent part as follows:
No member of the Senate or General Assembly, during the term for which he shall have been elected, shall be nominated, elected or appointed to any State civil office or position, of profit, which shall have been created by law, or the emoluments whereof shall have been increased by law, during such term.
The Appellate Division, in an unreported opinion, held that this clause rendered the appointment invalid inasmuch as there was a salary increase for the position of BPU Commissioner during the legislative term for which Mrs. Curran had been elected to the New Jersey General Assembly, even though she was not serving as a legislator at the time of the increase. We reverse. The appointment of Mrs. Curran as a Commissioner of BPU is valid.

I
On November 6, 1979 Barbara Curran was elected to a two-year term as a member of the New Jersey General Assembly. She was administered the oath of office on January 8, 1980. Her term was scheduled to end on January 12, 1982. In April 1980 a vacancy occurred on the BPU when then Commissioner Richard B. McGlynn resigned. On June 23, 1980 Mrs. Curran resigned from the Assembly and on the same day was nominated by Governor Byrne and confirmed by the Senate to succeed Mr. McGlynn. On June 24, 1980 the Governor formally appointed Mrs. Curran as a member of the BPU. She took the oath of office on June 26, 1980 and has been serving since that date.
On June 12, 1980, during Mrs. Curran's term in the Assembly, the fiscal 1980-81 appropriation bill, S. 1309, was introduced in the Senate. As part of that bill the salaries of certain state officials, including the Commissioners of the BPU, were raised *595 by $7000, from $49,000 to $56,000 per year. On June 23, 1980, the same day on which Mrs. Curran resigned from the Assembly and was nominated and confirmed as a BPU Commissioner, the Senate passed the appropriation bill. On June 26, the date Mrs. Curran was sworn in as a Commissioner, the Assembly likewise passed the same bill. Governor Byrne signed the appropriation bill on June 30, 1980 and it became effective July 1, 1980.
The instant suit was started on July 23, 1980. Plaintiffs are the Student Public Interest Research Group, a non-profit, non-partisan advocacy organization that has appeared as intervenor in utility rate cases. The individual plaintiffs are resident taxpayers and ratepayers to several public utilities regulated by the BPU. Defendants are Governor Byrne, Mrs. Curran, and George Barbour, president of the BPU. Plaintiffs sought a judgment declaring Mrs. Curran's appointment to the BPU void as violative of the ineligibility clause. They also asked for a declaration that any decision of the BPU participated in by Mrs. Curran is "null and void as unlawfully decided," and an injunction against Mrs. Curran's "exercise of and participation in decisions or activities" of the BPU.
In response to the assertion of the Attorney General, representing all defendants, that the trial court lacked subject matter jurisdiction pursuant to R. 2:2-3(a)(2), the trial court, with plaintiffs' consent, transferred the case to the Appellate Division. That court acknowledged the manifest qualifications of Mrs. Curran for the office of BPU Commissioner and the absence of "any endeavor or intent on the part of Curran or the Governor to evade or violate the provisions of the ineligibility clause," and further recognized that to declare Mrs. Curran ineligible might effect "an injustice truly not contemplated by the ineligibility clause." However, the Appellate Division held the appointment invalid because a "legislator is disqualified [under the ineligibility clause] if there is a salary increase during the legislative term for which she is elected, even though she is not then serving as a legislator." It enjoined Mrs. Curran's continuation as a BPU Commissioner but refused to declare *596 invalid those decisions of the BPU in which she had participated, inasmuch as they were "de facto acts that may not be attacked either directly or collaterally." Plaintiffs acquiesce in this latter ruling and have abandoned that phase of their attack. We granted a stay of the Appellate Division judgment during our consideration of the case on appeal, which presents a substantial constitutional question and hence is before us as of right under R. 2:2-1(a)(1).

II
As made clear by both the plurality opinion of Justice Mountain and the dissenting opinion of Chief Justice Hughes in Vreeland v. Byrne, 72 N.J. 292 (1977), the ineligibility clause in our State Constitution derives directly from a similar provision in the United States Constitution, namely, Article 1, section 6, clause 2, which was the result of a compromise. 72 N.J. at 306; id. at 315 (Hughes, C.J., dissenting). The brief historical background set forth in Vreeland, supra, may profitably be repeated here:
Certain delegates, led by Edmund Randolph of Virginia, generally fearful of too expansive Federal power, urged that no member of Congress should be eligible for appointment to any state or federal office during the term for which he should have been elected and for one year thereafter. Other delegates, including Alexander Hamilton, were opposed to any disqualification whatsoever. They feared that imposing any kind of ineligibility would result in able men being unavailable for public office. James Madison proposed the compromise arrangement that was substantially adopted. There should be no disqualification, he suggested, except in two respects: during the term for which he should have been elected no member of Congress might be appointed to "any civil office under the Authority of the United States" (1) "which shall have been created," or (2) "the Emoluments whereof shall have been encreased" during such term. [Id. at 306-07 (footnote omitted).]
A clause making legislators ineligible for appointment to civil office did not appear in the New Jersey Constitution until 1844. One major concern of the delegates was the potential for abuse inhering in the appointment powers of the Legislature, which powers were largely unchecked. Under the Constitution of 1776 all public officers, including the Governor, were appointed by the Legislature. The delegates to the 1844 convention removed *597 much of this appointment power and adopted as well the further safeguard of an ineligibility clause.
The debates on this latter provision were not unlike those over the parallel provision in the federal constitution. Some delegates argued that total ineligibility during a legislator's term was the only way to remove personal gain as a motive for holding office. See Bebout, Introduction to Proceedings of the New Jersey State Constitutional Convention of 1844 303-07, 518 (1942). On the other hand the president of the convention, Alexander Wurts, supported the clause with the following statement:
[I]f you restrict the members of the Legislature from all appointments, the state may suffer great injury. Suppose the office of Chancellor should become vacant, and the very man on whom all eyes were fixed as the one most competent and proper to fill it should be in the Senate. The Governor cannot look to either House to fill the office, and the state must suffer. The same effect would be produced if a vacancy should occur in the office of Chief Justice or Associate Justice of the Supreme Court. [Id. at 306.]
This position ultimately carried the day. The ineligibility provision as it appears in the Constitution of 1947 is, with but minor changes not significant to this case, substantially the same as that adopted in the 1844 Constitution.
Like its federal counterpart this clause reflects some obvious compromise in order to avoid unnecessarily broad ineligibility. It does not provide the best of all possible worlds  nor the worst. It is apparent that the delegates to the various constitutional conventions made no effort to solve all the problems that might arise from a legislator's eligibility for civil office. Certainly it does not appear  contrary to plaintiffs' contention  that executive influence was of great concern, for the framers of the 1844 Constitution treated the transfer of appointment power to the executive as a major reform, yet permitted the executive to appoint a legislator to an existing office. In addition, the record of the debates in convention demonstrates that the delegates were not so sanguine as to believe that there would not continue to be the potential for abuses, such as might be involved in a legislator's voting for a salary raise near the *598 end of the term in anticipation of subsequent appointment. But in pragmatic fashion the ineligibility clause serves as a curb on the potential for improper influence affecting a legislator's vote. The clause is directed not at the executive but at "legislative self-interest, i.e., the possibility that a legislator might be influenced in voting for a newly-created office or for compensatory increase for an existing office if he were eligible to be appointed to that office during his legislative term." Vreeland v. Byrne, supra, 72 N.J. at 318 (Hughes, C.J., dissenting).

III
The clause in question addresses two disqualifying events: a salary increase, and the creation of a new office. The question posed by this case goes to when that disqualifying event  here, a salary increase  must occur for the legislator to be rendered ineligible for office. Plaintiffs' position is that a legislator is disqualified from holding office, not just from being appointed, if the emoluments of that office are increased at any time during the full legislative term for which he was elected, even, as here, after the legislator has resigned from the Legislature and has been appointed to and is serving in that civil office. Defendants contend that ineligibility attaches only if the salary has been increased prior to the legislator's nomination or appointment during his current term of office.
An examination of the ineligibility clause makes it immediately apparent that its focus is on a legislator's eligibility for nomination or appointment to a civil office. It does not look to events occurring after appointment so as to result in the former legislator having to give up the civil office. The question to be answered is simply whether the legislator was qualified for appointment at the time the appointment was made. Obviously Mrs. Curran was so qualified.
First, the constitutional provision uses the future perfect tense: no legislator is eligible for appointment "to any State civil office * * * the emoluments of which shall have been *599 increased by law" during the legislator's term. The future perfect tense identifies that which must occur before the future event. In the instant context this means the salary increase must have been voted upon by the Assembly before Mrs. Curran's resignation from that body. It was not. That the disqualifying event must have occurred "during such term" means only that it must also take place during the legislator's current term of office  that is, an increase enacted in a legislator's prior term would not render him forever ineligible.
This interpretation of the clause finds support in the reality of the situation. The Attorney General, pointing out that the ineligibility clause does not purport to work a forfeiture of a position for which the legislator was eligible at the time of appointment, poses the following hypothetical situation that would result in forfeiture of office if, as plaintiffs claim, events subsequent to the appointment were to control:
Suppose that an individual resigned from the Senate only a few months after taking office for a four-year term and promptly accepted appointment as Attorney General. Suppose further that three and a half years later, the Legislature increased the emoluments of the office of Attorney General. Can that possibly mean that the individual was improperly appointed or that he was ineligible for office for three and a half years but that that fact just became known at this time: Must the Attorney General be deemed to have forfeited a Constitutional office by reason of the acts of a body of which he has not been a member for over three years? * * * Further, if [plaintiffs'] strained construction of the ineligibility clause were adopted, it would put the Legislature in a position where it could force the removal from office of a former legislator who had been appointed to the Office of Attorney General, or another executive or judicial position, simply by increasing his salary by $1.00. For the Legislature to be able to hold such a club over the head of an Attorney General or other executive or judicial officer, would certainly pose dangers to our government * * *.
The only previous case in New Jersey interpreting the ineligibility clause is Vreeland v. Byrne, supra. There the challenged appointment was made after the salary for the office in question had been increased. Although nothing in Vreeland resolves the issue of whether the disqualifying event must precede the *600 legislator's appointment in order for ineligibility to be established, authority elsewhere supports the result we achieve today.
Closely in point is Ryan v. Boyd, 21 Wis. 208 (1866). There a legislator had been elected county judge during his term of office as a legislator. After the judicial election the salary of the office was increased.[1] Construing constitutional language almost identical to the clause in the New Jersey Constitution, the Supreme Court of Wisconsin held that the legislator was entitled to continue serving as county judge. The court explained its holding in the following pertinent passage:
It is true the increase of the emoluments of the office was during the time the relator was a member of the legislature, but subsequent to his election to the office of county judge. Does such a case come within the prohibition of the constitution? It is not within the language of the provision, according to its most natural grammatical construction ... [T]he creation of the new office, or increase in the emoluments of an old one, must have taken place prior to the appointment or election of the member to such new office or existing one, to bring the case within the prohibition. The future perfect tense is used  an office "which shall have been created, or the emoluments of which shall have been increased," etc.  indicating a future action done or completed before the appointment or election, the other future action to which it refers. [21 Wis. at 213 (emphasis in original).]
Although the ineligibility clause of the federal constitution, Article 1, section 6, clause 2, has never been subject to judicial construction, one reported opinion of the Attorney General bears on this case. In 1969 the proposed appointment by President Nixon of Melvin R. Laird to the office of Secretary of Defense raised a question similar to that posed here. Laird had been reelected to the Ninety-first Congress, which was to convene on January 3, 1969. That newly-convened Congress would have before it, in the first few months of the session, a proposal to increase the salaries of the cabinet officers, including the Secretary of Defense. Laird inquired of the Attorney General whether *601 the ineligibility clause would preclude his appointment as Secretary of Defense were he to commence his congressional term. The Attorney General concluded the ineligibility clause would not operate to preclude such an appointment:
The constitutional language prohibits the appointment of a legislator to an office the compensation of which "shall have been" increased prior to the making of such appointment. The ban clearly does not apply to an increase in compensation which is proposed subsequent to the appointment. [42 Op. Att'y Gen. 35 (1968).]
These authorities view the problem from the same perspective as ours, i.e., the constitutional provision concerns eligibility at the time of the appointment. Cases relied on by plaintiffs either do not hold to the contrary, see State v. Wiseheart, 158 Fla. 267, 28 So.2d 589 (1946) (office holder was still member of legislature when pay increase bill was passed), or involve constitutional provisions materially different from New Jersey's, see State v. Sutton, 63 Minn. 147, 65 N.W. 262 (1895); Baskin v. Short, 107 Okl. 272, 232 P.2d 388 (1925).

IV
The operative act that marks the end of a legislator's potential disqualification in the context of the present case is resignation from the Legislature prior to the disqualifying event of a salary increase. Mrs. Curran, having resigned before the Legislature's passage of a salary increase for the office to which she was subsequently appointed, was properly appointed and sworn. She may continue to serve as a Commissioner of the BPU. The stay is dissolved and the judgment below reversed. No costs.
For reversal  Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER  6.
For affirmance  None.
NOTES
[1] Wisconsin, unlike New Jersey, see N.J.Const. of 1947, art. IV, § 5, par. 3, apparently had no constitutional prohibition against legislators holding other civil offices during their legislative term.